**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

XINJUAN BI, a/k/a CINDY BI,

Plaintiff,

v.

EMI NIETFELD, ADVANCE MAGAZINE PUBLISHERS INC., d/b/a CONDÉ NAST,

Defendants.

-----------------------------------------------------------------------X

Civil Case No. ___________

# COMPLAINT

Plaintiff Xinjuan Bi, a/k/a Cindy Bi ("Bi"), by and through her attorneys, Contarino Roth LLC and Sweigart Murdock, LLP, for a Complaint against Defendants Emi Nietfeld ("Nietfeld") and Advance Magazine Publishers Inc., d/b/a Condé Nast ("Condé Nast"), alleges and avers as follows:

## INTRODUCTION

1. In January 2024, Bi, a prominent and successful venture capitalist, and her husband Jorge Valdeiglesias ("Valdeiglesias") experienced a tragedy that only other grieving parents could fully comprehend. After months of eagerly anticipating the birth of their son, Baby Leon, their gestational carrier (surrogate), Rebecca Smith ("Smith")[1] experienced medical complications and delivered a stillborn baby following an emergency caesarean section. Mounting evidence has established that Baby Leon's death resulted from negligence—or worse—on the part of Smith, the surrogacy agency, and Carilion Roanoke Memorial Hospital ("Carilion"), where Smith was admitted.

[1] Rebecca Smith is a pseudonym Nietfeld and Condé Nast used in place of Bi's gestational carrier's real name. As the focus of this Complaint is Nietfeld and Condé Nast's defamation of Bi, Bi will use the name Rebecca Smith, which appears in the Article.

2. Nietfeld, a reporter who describes herself as a "journalist covering fertility technology and inequality," spent nearly a year cozying up to Bi, taking advantage of her openness in a moment of tragedy, to manufacture a "viral" magazine article for *Wired*—an article rife with omissions and falsehoods all designed to paint Bi as the villain and surrogacy as a process whereby evil technologists and venture capitalists (like Bi and Valdeiglesias) exploit hapless gestational carriers (like Smith).

3. Nietfeld's September 3, 2025, article, "The Baby Died. Whose Fault Is It?" (the "Article") magnified the tremendous pain and grief Bi and Valdeiglesias were experiencing by torching Bi's reputation, all in service of making Nietfeld's first full-length feature a "viral" magazine story.

4. Nietfeld larded the Article with innuendos, half-truths, misrepresentations, and tortured interpretations of the facts. But she did not stop there. The Article included the following: "Though it's highly unlikely, Bi could even go to jail: There's an arrest warrant out for Bi in Virginia for doxing Smith" (the "Arrest Warrant Statement"). Nietfeld even used the Arrest Warrant Statement as part of her short preview of the Article on her personal Instagram page, using the lure of a criminal drama to attract readers.

5. The Arrest Warrant Statement is categorically false. No person or agency has ever issued a warrant for Bi's arrest—not in Virginia or anywhere else, and not for doxing Smith or anything else.

6. Worse, Nietfeld knew the Arrest Warrant Statement was false, or, at a minimum, published it knowing she had no factual basis—no document, no credible information, no public record—to believe the Arrest Warrant Statement was true. While the high bar of actual malice limits Bi's ability to sue Nietfeld and Condé Nast for defamation for the full panoply of defamatory

falsehoods in the Article (for now), Bi has ample evidence, prior to conducting any discovery, that Nietfeld and Condé Nast published the Arrest Warrant Statement with actual malice.

7. Nietfeld's extensive efforts to research other aspects of the Article, including contacting local law enforcement agencies in Virginia, confirm her actual malice. Either Nietfeld engaged in the responsible reporting she claims she undertook in reporting the Article (i.e., verifying details regarding legal proceedings by reviewing legal documents) and therefore knew the Arrest Warrant Statement was false, or Nietfeld reported that Bi was facing jail time while deliberately blinding herself to facts that would readily disprove this claim.

8. Shortly after the Article was published, Bi's prior counsel sent a lengthy letter to Condé Nast, demanding various corrections to dozens of statements in the Article, including the Arrest Warrant Statement. Condé Nast's outside counsel responded, noting that *Wired* would issue several corrections to the Article. Condé Nast's attorney conceded that there was no arrest warrant in Virginia, merely a summons, which is issued *prior* to any determination of probable cause and cannot carry any direct risk of jailing. Yet Condé Nast refused to correct the Arrest Warrant Statement and instead published a corrected version of Nietfeld's Article on October 13, 2025, once again informing the world that Bi was facing jail time based on an outstanding warrant Nietfeld and Condé Nast knew did not exist.

9. Bi's reputation, the product of years of dedication and excellence, was destroyed in an instant. Nietfeld achieved the "virality" she sought based on her false portrayal of Bi as not just a vindictive monster, but also a criminal—someone facing an outstanding warrant for doxing in Virginia.

10. Bi suffered immense financial, emotional, and reputational harm as a result of the Article and the Arrest Warrant Statement: estrangement from friends and colleagues, sharply declining interest and investments in her venture fund, humiliation, depression, and more.

11. Bi gave *Wired* an opportunity shortly after the Article's publication to correct Nietfeld's egregious falsehoods, including the Arrest Warrant Statement. But *Wired*'s decision to leave the Arrest Warrant Statement in a corrected version of the Article left Bi no choice but to seek damages in this defamation action.

**PARTIES**

12. Plaintiff Xinjuan Bi, a/k/a Cindy Bi, is an individual domiciled in San Francisco, California.

13. Upon information and belief, Defendant Emi Nietfeld is an individual domiciled in New York, New York.

14. Upon information and belief, Defendant Advance Magazine Publishers Inc., d/b/a Condé Nast, is a corporation organized under the laws of the State of New York with its principal place of business in New York, New York.

**JURISDICTION AND VENUE**

15. The Court has subject matter jurisdiction in this case under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states: Bi is a citizen of California; Nietfeld and Condé Nast are citizens of New York; and the amount in controversy is far in excess of the jurisdictional minimum of $75,000.

16. The Court has personal jurisdiction over Condé Nast because Condé Nast conducts its magazine publishing business (including its publication of *Wired*) in the State of New York and

because Condé Nast engaged in tortious conduct in the State of New York by publishing the Article from its headquarters in New York.

17. The Court has personal jurisdiction over Nietfeld because, upon information and belief, Nietfeld is domiciled in the State of New York and engaged in tortious conduct in the State of New York by reporting, writing, and promoting the Article in the State of New York.

18. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(1) and (2). First, Condé Nast has its principal place of business in the Southern District of New York, and Bi is informed and believes that Nietfeld resides in the Southern District of New York. Second, a substantial part of the acts and omissions giving rise to this action took place in the Southern District of New York, as Bi is informed and believes that Nietfeld reported, wrote, and promoted the Article in the Southern District of New York; and Condé Nast published the Article in the Southern District of New York.

## FACTUAL ALLEGATIONS

### Bi and Valdeiglesias Experience Horrible Tragedy in Their Surrogacy Journey

19. Bi is an accomplished investor who founded CapitalX, a venture capital firm based in San Francisco. Bi has made successful investments in more than a dozen "unicorns" (start-up companies that achieved billion-dollar valuations), and some of America's most accomplished capital allocators have invested in her funds, including David Sacks, Marc Andreessen, and Sriram Krishnan. Bi was featured on a list of "30 of the Most Successful Early-Stage Startup Investors."

20. In 2022, Bi and her husband, Jorge Valdeiglesias, decided to start a family. For health and age-related reasons, Bi and Valdeiglesias opted for surrogacy.

21. Bi and Valdeiglesias contracted with Surrogate Alternatives Inc. ("SAI"), an agency that matches intended parents with gestational carriers.

22. SAI paired Bi and Valdeiglesias with Smith, a bank manager in Virginia, who agreed to carry their only male embryo: their son, Leon (“Baby Leon”).

23. As they desperately wanted children, Bi and Valdeiglesias put immense faith in Smith, with whom they entrusted the most precious thing in the world, their unborn son.

24. When they contracted with SAI and Smith, Bi and Valdeiglesias believed Smith was a single mother who lived with her young son in a healthy and positive environment. Upon information and belief and based on information Bi received from a private investigator, Smith cohabitated with a boyfriend who had a criminal history while serving as Bi and Valdeiglesias’s gestational carrier.

25. Bi and Valdeiglesias memorialized their agreement with Smith in a Gestational Surrogacy Agreement (“GSA”), which imposed various rights and obligations on the parties, including, as relevant here, Bi and Valdeiglesias’s right to make medical decisions on behalf of Baby Leon and their right to be consulted before Smith made any medical decisions involving a substantial or imminent risk.

26. In exchange for carrying Bi and Valdeiglesias’s son and honoring the various obligations in the GSA, Smith was entitled to substantial “reimbursements,” which Bi and Valdeiglesias paid.

27. Smith breached the GSA in several important respects prior to Baby Leon’s stillbirth. For example, Smith traveled out-of-state on or about December 23, 2023, which the GSA did not allow. Even worse, Smith requested reimbursement of multiple housekeeping invoices in the total amount of $2,400 for “Destiny by Londyn,” which she did not disclose was an LLC created by her undisclosed boyfriend. Bi and Valdeiglesias were unaware of Smith’s actions until after Baby Leon’s passing.

28. As a result of SAI's mismanagement, Smith was left without health insurance that would cover her surrogacy-related medical expenses, so Bi and Valdeiglesias purchased Smith an additional health insurance policy through an Affordable Care Act exchange to ensure her medical bills would be covered. Were it not for Bi and Valdeiglesias's diligence in obtaining this additional insurance policy on the last day such affordable coverage was available, there could have been a serious gap in insurance coverage with huge financial ramifications for all involved.

29. As Bi and Valdeiglesias were unaware of Smith's risky and unauthorized conduct during her pregnancy, they maintained a positive and cooperative relationship with Smith through her pregnancy, treating her and her son to a lavish vacation in San Francisco, regularly sending gifts and food delivery to their house, and treating her and her son like family.

30. Smith went to the emergency room twice during her pregnancy with Baby Leon. The first time, she went to the emergency room on December 15, 2023, for an unexplained water leak. Bi and Valdeiglesias were not provided with any details about this hospital visit.

31. On January 1, 2024, when Baby Leon was 29 gestational weeks, Smith went to the hospital again experiencing "leaking." Smith was admitted to Carilion for preterm premature rupture of membranes ("PPROM"), i.e., early water breakage. PPROM is a very serious condition that poses significant risks to unborn children. On New Years Eve, Smith's undisclosed boyfriend had DJ'd a party, making the timing of Smith's "leaking" very suspicious. Smith, Carilion, and the attending physicians did not provide Bi and Valdeiglesias with sufficient information about Smith's condition; if Bi and Valdeiglesias had all the facts at the time, they would have sought a second medical opinion from a maternal-fetal medicine specialist, and, if medically indicated, insisted that Smith receive an emergency c-section to safeguard Baby Leon's life. Instead, Smith was admitted

to Carilion with the expectation that she would remain at the hospital for the remainder of her pregnancy, which was expected to be an additional six weeks.

32. When Bi and Valdeiglesias expressed grave concerns about Baby Leon's precarious position, the physicians at Carilion rebuffed them and denied their request for a second opinion from a maternal fetal medicine specialist.

33. While Bi and Valdeiglesias expressed concerns to Smith about Smith's plan to have her seven-year-old son stay with her in the hospital, she insisted on letting him stay overnight at the hospital on six or more occasions in January, which compromised Smith's ability to focus on Baby Leon's health and wellbeing during her hospital admission.

34. On January 13, 2024, Smith snuck out of the hospital, a fact Bi and Valdeiglesias only learned after Baby Leon's death when a private investigator discovered Smith received a speeding ticket during her escapade. Smith's story was that she left the hospital to pick up "an obscure vitamin" at home—an explanation that defies credulity as Bi and Valdeiglesias could surely have arranged for the delivery of any possible "vitamin" a Level 1 trauma center hospital was somehow missing. Smith has never identified any nurse or other provider who authorized her departure, nor produced any discharge order or other hospital record reflecting that she was medically cleared or authorized to leave inpatient care.

35. The next day, Smith exhibited profuse vaginal bleeding, and her son was at her bedside. Smith failed to disclose the bleeding event to Bi and Valdeiglesias.

36. On January 18, 2024, Bi and Valdeiglesias pleaded with Smith to let them speak to Dr. Jamie Buck, her treating physician, about Baby Leon's medical status. Dr. Buck downplayed the risks associated with Smith's PPROM, assuring Bi and Valdeiglesias that "all was good," and neglecting to mention Smith's bleeding four days before their phone call. Dr. Brittany Kane was

the physician who reported the bleeding on January 14, 2024, without taking any follow-up action, but Bi and Valdeiglesias were never permitted to speak with her.

37. Smith, Carilion, and SAI all kept Bi and Valdeiglesias in the dark as to the risk posed by Smith's bleeding, namely the fact that it is a textbook indicator of placental abruption, a rare condition in which the placenta separates from the uterus before birth, which is life-threatening to the fetus.

38. The physicians at Carilion did not perform a c-section, and upon information and belief, did not consider that Smith had a placental abruption.

39. On January 21, 2024, during a routine patient check, a nurse detected a lack of fetal heart tones on the monitor and called the attending physician, who ordered an emergency c-section. Baby Leon was delivered stillborn.

40. Upon Baby Leon's delivery, the physicians saw evidence that Smith's placenta had completely detached from her uterus. The placental abruption was the cause of Baby Leon's death, but what caused the abruption, and when precisely it occurred, remains undetermined. The physicians were unable to determine the timing of the placental abruption. Baby Leon had deep scratches and cuts on his body, indicating that he was fighting for his life.

41. Bi and Valdeiglesias were informed of their son's death following a Facebook message from Smith's sister telling them to call the hospital because there was an emergency. Smith's sister was a total stranger to Bi and Valdeiglesias at that time.

42. In discussions with the labor and delivery team, Bi and Valdeiglesias were told there was no bleeding, which they now know to be false, and which is contradicted by medical documentation.

43. Bi and Valdeiglesias have been fighting to obtain Smith's full medical records as they relate to Baby Leon for nearly three years so they can better understand what led to Baby Leon's death.

44. Carilion, through Dr. Dianna Curtis, initially attempted to obstruct Bi and Valdeiglesias's request for an immediate autopsy, which Bi and Valdeiglesias were told would be conducted independently, and then provided Bi and Valdeiglesias with a heavily redacted version of it. Critically, the placental findings were redacted, and Bi and Valdeiglesias's subsequent requests for the underlying placental slides and pathology materials were rebuffed.

45. Carilion erroneously listed Smith, and not Bi and Valdeiglesias, as Baby Leon's legal parent on his vital records and have stonewalled Bi and Valdeiglesias's efforts to correct this error.

46. Smith and SAI have further refused to obtain and provide the HIPAA waivers and authorizations necessary for Bi and Valdeiglesias to obtain Smith's medical records for her stay at Carilion, despite their obligations to provide such records to Bi and Valdeiglesias under their contractual agreements.

47. Bi and Valdeiglesias were forced to file suit against Smith, SAI, Carilion, and other related entities and individuals, which case was later ordered to arbitration. The arbitration remains active and pending.

48. Bi was motivated by the tragedy caused by Baby Leon's death to advocate not just for herself, but for other intended parents who may find themselves unable to protect the lives of their children they have entrusted to gestational carriers through surrogacy agreements.

49. Bi's advocacy took the form of social media posts and a website, where she shared her story and argued for legal changes to protect others like her, Valdeiglesias, and most importantly, Baby Leon.

50. On two occasions—once before and once after the publication of the Article—Smith, assisted by pro bono attorneys in San Francisco, sought civil harassment restraining orders to prevent Bi from speaking out about her. The first case ended in a stipulated resolution, and the second case is still pending, with a second hearing on Bi's special motion to strike Smith's petition under California's anti-SLAPP law scheduled in September 2026.

Nietfeld Spends Months Cozying up to Bi to Craft a "Viral" Story

51. Bi and Valdeiglesias's nightmare got worse when Nietfeld and Condé Nast exploited their personal tragedy for internet clicks.

52. Nietfeld describes herself on her website as a "journalist covering fertility technology and inequality."

53. Aside from the Article itself, the "Fertility Reporting" section of her website includes the following articles: "The Parents Who Want Daughters—and Daughters Only"; "Designer Babies Are Teenagers Now—and Some of Them Need Therapy Because of It"; "To Be a Good Pregnancy Surrogate, It Helps to Be a Dominatrix First"; "America's IVF Failure"; and "The Exes Who Froze Embryos and Regret It." The throughline of these articles is that reproductive technology is bad, and so are the people who use it.

54. In 2024, Nietfeld and Jason Kehe, the magazine features editor at *Wired* believed they stumbled on a premise for a "viral story." Here's Kehe's version of the backstory, which *Wired* published in the wake of the Article's publication:

> But then a story comes along that reminds you why magazines exist and matter. Last year, after I published a feisty Q&A with the young CEO of a fertility startup, I got an email from a freelancer named Emi Nietfeld. She, like me, thought that fertility—a freakish obsession of Silicon Valley's tech elite and adjacent quasi-intellectuals—was undercovered by the media, and she had stories on the subject she wanted to pitch. "But are they *dramatic* stories, Emi?" I asked. "Will anyone actually want to *read them*?" Then I said: "At this point, if it's not 'Bad Art Friend,' I don't want it."
>
> "Bad Art Friend," if you somehow don't remember, was published by NYT Mag back in 2021, and it will likely go down in history as one of the last great magazine stories ever written. From the pettiest of premises is spun a human drama of such silly-epic proportions that you question your moralities, your loyalties, everything. "Surely," I said to Emi, "in the fraught world of 21st-century babymaking, there must be *something* like that. Something that will make people sit up and want to talk."

55. In October 2024, Bi was introduced to Nietfeld. Bi trusted Nietfeld and shared immense details about her surrogacy journey with Nietfeld, believing that an honest, detailed account of what took place would help bring awareness to the defects in the laws around surrogacy and ultimately help others like her, Valdeiglesias, and Baby Leon in the future.

56. Nietfeld emotionally manipulated a grieving mother to get information, telling Bi just what Bi wanted to hear so that Bi would trust her and divulge her secrets to her. Here's a small sample of how Nietfeld talked to Bi (the name of Bi's daughter is redacted):

Hi Cindy,
It's great to meet you too!

I am so so sorry about Leon. I can only imagine the devastation of your loss. I am so inspired by your advocacy to make sure it doesn't happen again.

Congratulations on 100 days for [redacted]!! She is soooo young and fresh.

Might sometime between 3-5 pm PST work tomorrow? If not, I can do 11/9 after 10 am PT.

I read everything on the site. If there's anything else you'd like me to read first, like lawsuit filings, I'd love if you sent them my way. Otherwise I'll just look forward to chatting.

Warmly,
Emi

57. For months, Nietfeld cultivated her relationship with Bi, gaining access to the most sensitive and painful details of Bi's tragic surrogacy journey. Bi shared just about every piece of information and every document Nietfeld requested. If Nietfeld wanted to know something, all she had to do was ask, and Bi would provide her primary source documents, personal recollections, and her thoughts and feelings.

58. Between November 2024 and July 2025, Bi and Nietfeld communicated extensively over email, text, and phone. Their text message log for this period alone exceeds one hundred pages.

59. On July 24, 2025, Nietfeld told Bi via text that the "story is going into fact check – hooray." In July and August 2025, Nietfeld and Bi continued to interact, as Nietfeld asked Bi to clarify or confirm many details related to Bi's story, and Bi continued to be maximally forthcoming and candid.

60. On August 6, 2025, Nietfeld gushed to Bi about her hope that the article (her first longform feature) would turn into a movie:

8/6/25 7:56:59 AM PDT

Emi Reporter NYC [redacted]

I would love if this story got optioned for a film. I think it could.

61. In August 2025, *Wired*'s fact-checker, Matt Giles, likewise contacted Bi with various factual questions, and as she did with Nietfeld, Bi provided Giles with everything he wanted to know that she could provide.

62. Altogether, Bi's communications with Nietfeld included an 187-page text log, dozens of emails, and hours of recorded phone conversations.

Condé Nast Publishes the Article, Which Is Rife with Falsehoods

63. On September 3, 2025, *Wired* published the Article. Attached hereto as **Exhibit 1** is a copy of the Article as it was published on this date, prior to any correction.

64. Bi eagerly anticipated its release, believing that Nietfeld would honestly portray her story. Nietfeld instead delivered on Kehe's wish for a "*dramatic*" story, one in which Bi was cast as the villain through omissions, misrepresentations, and full-fledged defamation that permeated the Article.

65. From the very first sentence of the Article, Nietfeld portrayed Bi not as a grieving mother betrayed by individuals and institutions she trusted—and paid—to safeguard the life of her baby, but as a vengeful and vindictive antagonist. Nietfeld wrote that "Cindy Bi is not supposed to be telling me this story," citing a "confidentiality clause" in an unspecified agreement, a "restraining order against Bi," and a "court-ordered agreement saying she would not so much as mention the 'surrogate' involved in Baby Leon's stillbirth." Yet Nietfeld knew that there was no restraining order in place—she even congratulated Bi when Bi told her it had been lifted and replaced with a stipulated agreement between the parties that allowed Bi to share details from public court filings. The stipulation provided for a notice-and-cure process, which Smith never invoked. When Bi sued Smith, SAI, and others in San Diego Superior Court, the judge denied

Smith's attempt to seal the pleadings, indicating that Smith had no legal right to prevent Bi from sharing her and her son's story publicly.

66. Nietfeld next misrepresented Bi's perception of Smith's criminal liability: "'I want the surrogate to be known for what she did, to be set as an example,' Bi tells me. 'I hope she goes to jail.' Ideally, for murder." Bi never told Nietfeld that Smith committed murder or that she should be imprisoned for committing murder. Nietfeld added this false detail to make her piece more "*dramatic*."

67. Early in the Article, Nietfeld zoomed out to provide background context on surrogacy in America. Even here, Nietfeld revealed her bias and animus against the people who use reproductive technologies, dismissing them as "techies" rather than people from all walks of life who want a family but cannot conceive a child through traditional means: "A shocking number of techies now believe growing a baby can be a straightforward business transaction."

68. While Nietfeld named Bi in the Article and provided the most personal details of Bi's life (including fabricated and false details), when Nietfeld pivoted to profiling Smith, she explained that she is "using a pseudonym to protect her privacy," yet again revealing her sympathy for Smith and animus toward Bi.

69. Nietfeld further gave the impression that Smith was a surrogate not for financial reasons, but simply because she "wanted to help a family who couldn't carry their own child." Yet Nietfeld declined to include Smith's falsification of housekeeping invoices in the Article, a detail wholly inconsistent with her angelic depiction of Smith.

70. When Smith was hospitalized, Bi was concerned—as any mother in her position would be. Yet Nietfeld framed Bi's worries as problematic, describing her questions to Smith about

what was going on as "pester[ing]." Nietfeld further reported that Bi "asked her husband if she was out of line," which is false.

71. In describing the events leading to Baby Leon's stillbirth, Nietfeld ignored the significance of Smith's prior bleeding events, glossed over Smith's activities, and framed Baby Leon's death as an unexplainable tragedy rather than something that could have been prevented if Smith, Carilion, and the physicians had handled the situation differently. Nietfeld further refused to contact the hospital to verify Smith's claim that she left the hospital to go home to obtain an "obscure vitamin," citing ethics, despite Nietfeld's willingness to contact many other people and institutions connected to Bi's story.

72. Nietfeld stooped so low as to spin Bi's description of her grief about Baby Leon into a suggestion that Bi wanted a "white" son—a detail Bi's detractors in the social media comment section latched onto: "What shocked Bi, when she arrived at the hospital, was the joy she felt with her stillborn child. 'He was a white boy, just like his dad.'" Nietfeld furthered the subliminal, false accusation of racism by noting that Smith's undisclosed boyfriend, which Bi's private investigator uncovered, "was Black," a detail that was totally irrelevant to Bi. Indeed, Nietfeld's description of the private investigator's conclusions reads as highly skeptical, despite the private investigator's objective findings.

73. Nietfeld also credited SAI's inaccurate description of Smith's bleeding episode prior to Baby Leon's stillbirth as "some light pink fluid which the doctor was not concerned about," when, in fact, profuse bleeding had occurred.

74. Nietfeld juxtaposed Bi's statement that Baby Leon's death was preventable with a discussion of Bi "attend[ing] Epic Church (known for hosting high-profile VCs)"—rather than a

discussion of how Smith exhibited telltale signs of placental abruption and how an emergency c-section could have saved Baby Leon's life.

75. After omitting details that support Bi's version of events and embellishing the facts to make Smith seem credible and sympathetic, Nietfeld described Bi's version of events as "far-fetched." Worse, Nietfeld wrote that "Bi understood how far-fetched her allegations sounded." Bi never gave Nietfeld any indication that she believed her version of events was far-fetched. Rather, Bi described the facts she experienced as "shocking," referring to the egregiousness of Smith's conduct, not its plausibility.

76. To further her narrative of Smith's innocence and victimhood and to support false descriptions of Bi as irrational and vindictive, Nietfeld wrote that Valdeiglesias "blamed the hospital, not Smith[.]" That statement is false. Before the Article's publication, Valdeiglesias told Giles, *Wired*'s fact-checker, that he did indeed blame Smith.

77. Consistent with her goal of painting Bi in the worst possible light, Nietfeld wrote, "Bi iMessaged a photo of Leon's corpse to Smith's 7-year-old son's iPad." Bi had actually sent an artistic and stylized photo of Baby Leon's hands next to Bi's with a bracelet and a blue heart—the type of photo a grieving mom might post on social media to commemorate her son's passing—nowhere near the type of image the word "corpse" evokes. Indeed, Nietfeld described the photograph very differently in another portion of the Article: "Bi photographed Leon in a white gown and diaper, holding a blue crocheted heart." A reader would never know that Nietfeld is describing the same photograph in both instances and would almost certainly believe Bi sent Smith's son something markedly different.

78. Nietfeld further accused Bi of having "[c]alled the FBI 12 times," chalking up the FBI's repeated return calls *to* Bi as Bi calling the FBI.

79. Nietfeld falsely reported that Bi has bipolar disorder. Bi does not have bipolar disorder, and she never told Nietfeld that she did. Nietfeld claims to have sourced this information from a stray billing code on a medical document Bi shared, but Nietfeld never bothered to fact-check this sensitive detail before printing it in a national magazine.

80. In discussing Bi's second surrogacy journey with the gestational carrier of her daughter, Nietfeld stated that Bi "told me for months that everything with Chelsea Sanabria had been easy and smooth" before immediately discussing Sanabria's medical complications during her surrogacy, giving readers the impression that Bi had no regard for Sanabria's health. Bi never used the phrase "easy and smooth"—she had repeatedly praised Sanabria and described their warm, enduring relationship. And Sanabria herself stated the following in a publicly filed declaration dated, January 5, 2025: "I had a wonderful experience being Ms. Bi's surrogate, I consider them to be family now. If I had not undergone medical complications during my surrogacy, I would have gladly been a surrogate for Ms. Bi again." Nietfeld stated after publication that she had reviewed all the underlying legal documents. Those documents included Sanabria's testimony about her own surrogacy experience. Nietfeld omitted that testimony from the Article, likely because it contradicted the villainous portrayal of Bi that Nietfeld advanced.

81. Nietfeld also suggested that Smith and Sanabria's medical complications arose from Bi and Valdeiglesias's medical history, writing that "Valdeiglesias told me that his aunt had her water break early"—leaving out the detail that Valdeiglesias's "aunt" was not his genetic relative. And even though *Wired* begrudgingly corrected the Article to report that Bi did indeed disclose her family history of gestational diabetes to Sanabria before their surrogacy journey, Nietfeld nonetheless wrote that Bi and Valdeiglesias "almost certainly won't disclose" their relevant family medical history to a future surrogate.

82. Nietfeld gave readers the impression that Smith was facing imminent financial ruin because of Bi, writing, "[h]undreds of thousands of dollars of medical bills are in Smith's name". The real number was approximately two thousand dollars.

83. Nietfeld further implied that Bi could face contempt of court for sharing details about Smith despite the stipulation she and Smith entered into, ignoring the stipulation's provision that Bi could share public court filings (which, again, contain all the relevant details about the surrogacy journey).

Nietfeld and Condé Nast Falsely Accuse Bi of Having an Outstanding Warrant for Doxing

84. Immediately after her false implication about contempt of court, Nietfeld included the single most defamatory statement in the article: "Though it's highly unlikely, Bi could even go to jail. There's an arrest warrant out for Bi in Virginia for doxing Smith."

85. On September 3, 2025, the day the Article was published, Nietfeld promoted the Article on her personal Instagram page, including a "preview" of the Article as the text of her post. Nietfeld's preview included the sentence, "An arrest warrant[,]" doubling down on the false claim that there was a warrant for Bi's arrest (the "Arrest Warrant Post"):




86. The Arrest Warrant Statement and the Arrest Warrant Post are false. There is no arrest warrant for Bi, in Virginia or anywhere else, for doxing Smith, or for anything else.

87. Throughout the Article, beginning with the lead, Nietfeld embellished and misrepresented the facts to give readers the impression that Bi faced significant legal liability. Nietfeld's false reporting of an outstanding "arrest warrant" is consistent with that theme.

88. It is possible Nietfeld got the idea for the Arrest Warrant Statement and the Arrest Warrant Post from Smith's declaration in support of her original petition for a civil harassment restraining order, dated October 1, 2024, in which Smith's counsel wrote: "Petitioner contacted her local police in [city omitted], Virginia and submitted a complaint for harassment and stalking under Virginia Law. The Virginia police told Petitioner they issued an active warrant; however,

since the crime is a misdemeanor and Respondent is out of state, the police stated they would not serve Respondent." (brackets in original).

89. Smith and her counsel's statement about the arrest warrant was a lie, and regardless of whether Nietfeld initially relied on the restraining order petition, Nietfeld either knew the Arrest Warrant Statement was false when the Article was published, or she acted with reckless disregard for the truth.

90. Smith's own Exhibit X1 to the same restraining order petition contradicts her counsel's representation about an arrest warrant. The police report Smith submitted with her petition shows that the police told Smith that her dispute with Bi was a ***civil*** matter and that Smith obtained a ***summons*** (very different from an arrest warrant). This exhibit therefore disproves Smith's claim that an "arrest warrant" has been issued. As Nietfeld claims to have read the legal documents that include Exhibit X1, Nietfeld knew there was no arrest warrant, and at most a civil summons, before the Article's publication, or published the Article with reckless disregard of that fact. Moreover, Smith never included the summons she supposedly obtained in any court filing, so there is no indication Nietfeld saw a warrant, a summons, or any other such document before reporting that Bi was facing an outstanding warrant.

**CITY OF SALEM POLICE DEPARTMENT**

**36 EAST CALHOUN STREET, SALEM, VIRGINIA 24153**
**RECORD DIVISION**

**REPORT SUMMARY**

---

SALEM POLICE DEPT NO: **2024-2217** USE THIS NUMBER FOR INQUIRY.

DATE: **8-28-2024**

TO: [redacted]

OFFENSE: **Fraud- False Statement**

DATE OF OFFENSE: **6-14-2024**

INITIAL REPORT TAKEN BY OFFICER: **Officer Young**

CASE ASSIGNED TO (IF APPLICABLE):

---

We are in receipt of your request for an offense report from our department. We cannot furnish copies of the requested report due to state guidelines and the policy of this department. However, we can provide pertinent information to affected parties. Should you have further questions, please direct your inquiries to this office.

---

**On 6-14- 2024 Officer Young was dispatched to the lobby of the Salem Police Department to speak with the complainant regarding a civil issue. Upon arrival the complainant stated that she was being harassed. The Officer advised her that this appears to be a civil issue. A summons was obtained in this case by the complainant.**

**Nothing Further.**

OTHER INFORMATION:

- ☐ OUTSIDE JURISDICTION OF THE CITY OF SALEM POLICE DEPARTMENT
- ☐ CANNOT LOCATE WITH INFORMATION GIVEN. PROVIDE MORE DETAILS
- ☐ PLEASE REMIT FEE OF TEN DOLLARS ($10.00) & STAMPED ENVELOPE.
- ☐ VIRGINIA LAW PROHIBITS RELEASE OF REQUESTED INFORMATION.
- ☐ FULL NAME OF CLIENT/VICTIM MUST BE PROVIDED.

Supervisor

SPD 318

91. Smith's counsel's statement about the arrest warrant is inherently improbable, irrespective of the police report confirming the Arrest Warrant Statement and the Arrest Warrant Post's falsity. Under Virginia Code § 19.2-72, "an officer authorized to issue criminal warrants" may issue an arrest warrant after reviewing a criminal complaint (including one submitted by a

private party) and determining that there is probable cause. Under Virginia Code § 19.2-71, only a judge, magistrate, or judicial clerk may issue the warrant. A summons, in contrast, may be directed at a witness to appear so that a *judicial officer* may determine whether probable cause exists before issuing a warrant. It is inherently improbable under this legal framework that a *police department* (as opposed to a judicial officer) issued a warrant for Bi's arrest without any record of a criminal complaint or a finding of probable cause.

92. In a sworn court filing, Smith stated that Nietfeld called her by mistake when she was intending to contact a law enforcement agency in Virginia, indicating that Nietfeld knew she could and indeed did try to contact law enforcement agencies as part of her reporting. If Nietfeld had inquired about the Arrest Warrant Statement, she would have been told that it did not exist, indicating that Nietfeld either knew it was false or refused to consider facts that would have revealed its falsity.

> 28. The reporter also reached out to my sister, [redacted] About a month after the reporter's initial email, I learned my housekeeper had also been contacted by the reporter seeking information about me and the surrogacy. Separately, that same reporter called my personal cell phone directly and left me a voicemail; based on the content of the message, the reporter appeared to believe she was reaching local law enforcement, not me. I do not know how the reporter came to have my cell phone number for that purpose.
>
> Case No. [redacted] 7 DECL. OF [redacted] ISO OPP TO SPECIAL MOTION TO STRIKE

93. Indeed, Nietfeld had revealed to Bi via text message her extensive efforts to track down documents relating to Bi's police reports. If she had engaged in remotely similar diligence with respect to the Arrest Warrant Statement, she would have known no arrest warrant existed.

5/14/25 11:09:57 AM PDT

Emi Reporter NYC ([redacted]

Yes please give me any updates! I called the Roanoke police but it sounds like they can't talk to me without you

5/14/25 11:10:13 AM PDT

Emi Reporter NYC ([redacted]

I would like to get a copy of the report. Could you try them?

5/14/25 11:15:36 AM PDT

I don't know what they filed in the report. Did I forward you the email to sergeant?

5/14/25 11:15:55 AM PDT

Let me email the sergeant and cc you?

5/14/25 11:19:29 AM PDT

Emi Reporter NYC ([redacted]

Great can you do that and explicitly give her permission to talk to me?

5/14/25 11:19:40 AM PDT

Yes. It's Melissa right?

94. Nietfeld emailed local enforcement in Virginia to track down various details for the Article. Nietfeld thus either knew she should have exercised similar diligence with respect to the supposed arrest warrant, but willfully blinded herself to the truth, or she knew the Arrest Warrant Statement was false and she published it anyway.

Emi Nietfeld [redacted]
to Melissa, bcc: me

May 14, 2025, 12:07 PM

Thanks for the intro, Cindy, moving you to BCC.

Hi Sergeant Foster,
I hope you're having a great day. The story I'm writing is for WIRED magazine. I went through the comms department and filled out a request online but as I am not a party to this complaint they couldn't give me any information. Officer Gilley reviewed my request.

I would really love to talk with you and to get a copy of any documents you have related to this, as it's part of my story. Is there anything else that you'd need to enable that? Cindy has kindly offered to give the permission you might need.

I'm at [redacted] if it's easier to give you a call.

Thank you!
Emi

95. Bi connected Nietfeld with the police officer tasked with investigating Bi's report regarding Baby Leon's death, and Nietfeld later confirmed to Bi that she was able to speak to someone from the police department.


5/16/25 9:11:25 AM PDT

Did the sergeant ever talk to you? She can easily call the hospital with a criminal investigation to verify

1) which nurses let [redacted] out and allowed her back in on 1/13/24 without discharge;
2) which doctor told [redacted] not to tell me about bleeding on 1/14/24.

But she simply told me the hospital told her they didn't see criminal acts so didn't report any to the authorities and that's it.

5/16/25 9:56:19 AM PDT

Emi Reporter NYC ([redacted])
I spoke to a comms person from the police

96. Nietfeld's extensive efforts to track down various details from law enforcement agencies shows that Nietfeld knew she should have sought to verify the Arrest Warrant Statement, and that she knew exactly how to do so.

97. Nietfeld wrote the Article with the backing of a major publication that supplied fact-checkers, who spent weeks going back and forth with Bi over all sorts of details related to the story. The existence of a criminal record is an objective, ascertainable fact. As there is no arrest warrant, Nietfeld could easily have determined, and likely did determine, that it does not exist.

98. Searches of three proprietary databases do not contain any suggestion that there is an arrest warrant out for Bi. Nietfeld and Condé Nast could easily have verified that no arrest warrant existed by consulting a database.

99. On September 25, 2025, the Association of Healthcare Journalists published an interview with Nietfeld about the Article. Nietfeld's discussion of her reporting practices makes

clear that the Arrest Warrant Statement could only have been the product of recklessness, at best, and willful lies, at worst. Moreover, Nietfeld gave this interview after Bi's counsel's correction letter (see Paragraph 106), so Nietfeld was on notice as of the time of this interview of the gaping errors in the Article. Nevertheless, Nietfeld made three revealing statements in this interview.

A. First, she acknowledged that Bi was extremely forthcoming. This indicates that if Nietfeld had asked Bi about a possible warrant, Bi would have disabused her of that notion.

**How did you gain access to such sensitive materials and persuade people to talk?**

I first met Cindy Bi through a founder she knew, and she was eager to have her story told. She'd been documenting everything — screenshots, emails, litigation filings — and was very forthcoming in sharing those with me.

One thing I've learned is that many people will say they want to tell their story, but very few come back with documents. Early on, I told Cindy that was something I'd need, and she had kept meticulous records. That gave me a foundation to build the reporting.

B. Second, Nietfeld referenced Condé Nast's extensive fact-checking resources, which were available to her to ascertain the Arrest Warrant Statement's falsity. Nietfeld also claims to have been transparent about what facts could and could not be confirmed with existing documents. Yet Nietfeld reported the Arrest Warrant Statement as objective truth without ever seeing any proof that the warrant existed, which it did not. Nietfeld therefore understood that she should not have presented any legal claims lacking documentary support as verified facts, but she did exactly that when she and Condé Nast published the Arrest Warrant Statement.

**Once you had the documents, how did you fact-check medical and legal claims?**

Condé Nast has a full fact-checking process, so we requested comments from people and institutions named. I also pulled the lawsuit filings directly from the California court system to confirm details. I spent two weeks adding hundreds of annotations to the draft which pointed to the original sources.

With medical and legal claims, I tried to be clear with readers: here's what one side alleges, here's what the other side disputes, and here's what can be confirmed in official records. For example, one party claimed in a lawsuit filing that she'd nearly died during a C-section, but without access to the medical records, I framed it as part of her legal filing, not as a verified fact.

C. Third, Nietfeld claimed to have maintained fairness by relying on documentation. This indicates that Nietfeld knew it was reckless to publish the Arrest Warrant Statement as objective fact without any supporting documentation.

**How did you ensure fairness when you had asymmetrical access to sources?**

It was a unique situation, where one party was eager to talk while the other wouldn't go on the record, citing the confidentiality clause in their contract. I leaned heavily on documentation—restraining orders, legal filings, and direct quotes. I also tried to explain the reasoning behind people's actions when possible, even if they might come across negatively.

A principle I relied on was letting characters speak for themselves — through quotes from documents, through their own words—so that my voice didn't overshadow theirs. I tried to avoid unnecessary editorializing.

100. On September 17, 2025, Nietfeld was interviewed about the Article on "Here & Now," a nationally syndicated public radio show. The show's host mentioned the supposed arrest warrant while interviewing Nietfeld, and Nietfeld did not address the warrant, suggesting that Nietfeld knew she had falsified that aspect of the Article and was trying to evade the detection of her lie.

101. On September 26, 2025, Jason Kehe discussed the Article on *Wired*'s podcast, "Uncanny Valley," where he again disparaged people who use reproductive technology, referring to the "larger freakish obsession [Silicon] Valley has with fertility."

102. Despite extensively fact-checking other claims in the Article, Matt Giles did not ask Bi any questions related to the Arrest Warrant Statement or, to Bi's knowledge, do anything to confirm the truth or falsity of that critical statement.

Bi Seeks Corrections, and Condé Nast Leaves the Arrest Warrant Statement Intact Despite Correcting Other Errors in Nietfeld's Article

103. Nietfeld and Kehe achieved their objective: the Article achieved "virality." On September 3, 2025, *Wired* linked to the story on X with the following text: "When her son died in utero, a venture capitalist went to extremes to punish her surrogate." *Wired*'s framing confirms its bias and animus against Bi, as it is yet another attempt to disregard how she, Valdeiglesias, and Baby Leon suffered a tragedy because of the negligence and recklessness of others. The post is also notable because it has been viewed over ***thirteen million times***, which speaks to the Article's virality.

104. Indeed, almost a year a later, Nietfeld continues to bask in the Article's "success." On the portion of her website listing her twenty published articles and essays, the Article is placed at the top, occupying the full page, above the two-column layout containing the rest of her work.

105. Almost a year a later, Nietfeld's "pinned" post on X is still her September 3, 2025, post promoting the Article.

106. On September 19, 2025, Bi's then counsel, Neville L. Johnson, Esq., sent Condé Nast a demand for the correction of forty-nine separate claims in the Article, including the Arrest Warrant Statement. Johnson wrote: "We are not aware of any arrest warrant. Can you please **provide a record**?"

107. On October 13, 2025, Condé Nast's outside counsel, Katherine M. Bolger, Esq., responded on behalf of Condé Nast. Bolger noted that *Wired* would issue several corrections, but she disputed the majority of Johnson's letter. Incredibly, Bolger described the Arrest Warrant Statement as "substantially true" while conceding there was no actual warrant:

> - **Statement 3, relating to an outstanding warrant in Virigina and the possibility of jail time.** It is substantially true to state that Bi has an arrest warrant out in Virigina and faces jail time. A Class 1 misdemeanor summons was issued by the City of Salem Police Department on June 14, 2024, for violation of Virginia Code § 18.2-186.4. In Virginia, a conviction of a Class 1 misdemeanor can result in confinement in jail for up to 12 months. As of May of this year, the warrant was outstanding.

108. Bi has no belief or information as to the existence of a "Class 1 misdemeanor summons was issued by the City of Salem Police Department on June 14, 2024." Bi has never been able to obtain any summons related to a criminal matter (if one even exists) despite diligent efforts. The June 14, 2024, date referenced in Bolger's letter corresponds to the date mentioned in the police report depicted above in Paragraph 90. That report describes Smith's complaint as "civil" without specifying what kind of summons was issued. It thus appears Bolger's reference to a "misdemeanor summons" is at best an extrapolation. But even if Bolger is correct, there is a major difference between a "summons" and a "warrant." As explained above, under Virginia law, a "summons" requires a witness to appear in court so that a probable cause determination can be made. A "warrant" is issued by a judicial officer after a probable cause finding, and it allows for the arrest of a criminal defendant. Bolger's letter acknowledges that the Article implies that there has already been a finding of probable cause that Bi committed a crime, which allows law enforcement to arrest her. Yet Nietfeld and Condé Nast knew for certain that there was, at most, an unserved summons, which, if served, would require Bi to appear in court so a probable cause determination could be made prior to the issuance of any arrest warrant.

109. On October 13, 2025, the same day Bolger responded to Bi's former counsel's correction demand, *Wired* published an updated version of the Article, a true and correct copy of which is attached hereto as **Exhibit 2.**

110. The updated version of the Article contained the following correction note at the very bottom, summarizing each of the changes in the updated version of the Article:

> *Update: 10/13/2025, 1:15 EDT: Wired has clarified some of the article's details, which include the number of phone calls to the FBI, whether Bi's second gestational carrier understood the surrogacy risks, and Bi's denial of what information was conveyed to Smith's new employer. Wired has also clarified whom Valdeiglesias blames for Leon's death.*

111. Even though Condé Nast's counsel admitted that no *warrant* existed, Nietfeld and Condé Nast refused to correct the Arrest Warrant Statement in the updated version of the Article, which still states: "Though it's highly unlikely, Bi could even go to jail: There's an arrest warrant out for Bi in Virginia for doxing Smith."

<u>Bi Suffers Immense Harm in the Aftermath of the Article's Publication</u>

112. As a result of Nietfeld and Condé Nast's false and defamatory statements, Bi suffered significant damages.

113. In addition to posting the two versions of the Article referenced above, Condé Nast promoted the Article extensively on social media, including posting the Article on *Wired*'s X, Facebook, Bluesky, Instagram, TikTok, LinkedIn, and Threads pages on September 3, 13, 21, 26, 28, 29, and 30, and December 30, 2025, and February 1, 2026; labeling the Article as its "Big Story" on September 7, 2025; including the Article on its Longreads syndication on September 7, 2025; publishing an interview with Nietfeld about the Article on September 16, 2025; and publishing a podcast by *Wired*'s editor, Kehe, about the Article, on September 26, 2025. Nietfeld further promoted the Article in various video, written, and radio interviews, including on September 17, 21, and 25, 2025.

114. The Article resulted in a massive onslaught of hate directed at Bi because Nietfeld contorted and even made up facts to paint Bi as a villain in a story in which she was actually the victim.

115. Hundreds of people posted hateful messages about Bi, and others sent horrible messages to her personally, including a message wishing that she would die of ovarian cancer.

116. The Arrest Warrant Statement was a significant cause of the hatred Bi received, as evidenced by the following post on X:




117. Bi suffered significant emotional distress, reputational injury, and economic losses because of Nietfeld and Condé Nast's defamation of her. Bi is distraught about the fact that millions

of people believe she is a terrible person, and indeed, a criminal, because of the false reporting in the Article. As a result, Bi suffered tremendous anguish, shame, and depression. Bi has faced estrangement from friends and colleagues who believed the falsehoods in the Article. Bi and Valdeiglesias have had to pay for private security to protect themselves and their daughter given the public animosity their family faces. As a venture capitalist, Bi relies on her public reputation to raise funds and cultivate relationships with founders: the damaging lies in the Article have compromised her reputation and therefore her ability to succeed as a venture capitalist. The emotional distress caused by the Article further limited her ability to focus on her work, thus compromising her ability to earn a living. Nietfeld and Condé Nast's defamation of Bi further impaired her and Valdeiglesias's ability to have additional children through surrogacy, despite having remaining frozen embryos they intended for use in gestational surrogacy.

## CLAIM FOR RELIEF

### Count One: Libel (Against All Defendants)

118. Bi realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

119. Nietfeld and Condé Nast published written, factual, defamatory statements of and concerning Bi when (1) *Wired* published the following statement in the original September 3, 2025, version of the Article: "Though it's highly unlikely, Bi could even go to jail: There's an arrest warrant out for Bi in Virginia for doxing Smith."; (2) Nietfeld referenced an "arrest warrant" in the Arrest Warrant Post, dated September 3, 2025; and (3) *Wired* left the Arrest Warrant Statement in its October 13, 2025, corrected version of the Article.

120. The Arrest Warrant Statement and the Arrest Warrant Post are false: there is no arrest warrant for Bi in Virginia (or anywhere else) for doxing (or anything else) and Bi therefore faces no risk of jailing as a result of such a warrant.

121. The foregoing statements were published to third parties: *Wired* disseminated both versions of the Article on the internet; and Nietfeld published the Arrest Warrant Post on her public Instagram page.

122. Nietfeld and Condé Nast published the Arrest Warrant Statement in the original Article and Nietfeld published the Arrest Warrant Post with actual malice as they knew those statements were false at the time of publication, or, at a minimum, acted with reckless disregard for the truth, as evidenced by the following: there is no record from any court or law enforcement agency in Virginia (or anywhere else) indicating that there is an arrest warrant for Bi for doxing (or anything else), so any search of law enforcement databases would confirm the falsity of the statement; the Arrest Warrant Statement is inherently improbable as there could not have been a warrant for Bi's arrest issued by a police department in Virginia before the filing of criminal charges; Nietfeld's statements in an interview that she "leaned heavily on documentation—restraining orders, legal filings, and direct quotes" in reporting the Article and that "Condé Nast has a full fact-checking process," both of which, if true, would have led Nietfeld and Condé Nast to discover that there was no such warrant; Nietfeld's statement in an interview that Bi was very forthcoming, thus allowing Nietfeld and Condé Nast the opportunity to fact-check the Arrest Warrant Statement with Bi; Nietfeld contacted law enforcement authorities in Virginia multiple times both in writing and over the phone in the course of reporting the Article, which establishes that Nietfeld knew that legal allegations required objective backing and would have put her on notice that no such backing existed for the Arrest Warrant Statement; Nietfeld communicated

extensively with Bi for almost a year in reporting the Article, including a 187-page text log, dozens of emails, hours of phone conversations, and a succession of rapid-fire questions shortly before publishing the Article, but never once asked Bi about the supposed arrest warrant, demonstrating Nietfeld's purposeful avoidance of the truth; Condé Nast's fact-checker Matt Giles never asked Bi about the supposed arrest warrant, demonstrating Condé Nast's purposeful avoidance of the truth; Nietfeld framed the story to paint Bi as a villain and to create maximum sympathy for Smith (whom Nietfeld shielded with a pseudonym), distorting and misrepresenting the facts to do so; Nietfeld hoped the Article would get "optioned for a film" and therefore wanted to make it as salacious as possible without regard for the truth; Nietfeld's editor at *Wired*, Jason Kehe, urged Nietfeld to write a "*dramatic*" story, namely a "human drama of such silly-epic proportions that you question your moralities, your loyalties, everything" and therefore encouraged Nietfeld to deviate from the facts in service of writing a "viral" article; Nietfeld and Kehe both believed that "fertility" was a "freakish obsession of Silicon Valley's tech elite and adjacent quasi-intellectuals"; and Nietfeld declined to discuss the Arrest Warrant Statement despite the "Here & Now" interviewer bringing it up while interviewing Nietfeld about the Article, indicating her knowledge that the statement was false.

123. Nietfeld and Condé Nast published the Arrest Warrant Statement in the corrected version of the Article on October 13, 2025 with actual malice as they knew those statements were false at the time of publication, or, at a minimum, acted with reckless disregard for the truth, as evidenced by the following (in addition to the facts alleged in paragraph 122): Condé Nast's outside counsel conceded in writing that there was only a "summons" (which, in Virginia, occurs prior to a probable cause finding and carries no direct risk of jailing), and not an arrest warrant.

124. The Arrest Warrant Statement and the Arrest Warrant Post are defamatory *per se* because they charge Bi with criminal conduct for which she faces a direct risk of jailing.

125. As a result of Nietfeld and Condé Nast's defamatory statements about her, Bi has suffered damages in the form of reputational harm, severe emotional distress, humiliation, economic losses, lost business opportunities, and the inability to have additional children through surrogacy.

126. Nietfeld and Condé Nast acted with malice toward Bi, thus entitling Bi to an award of punitive damages.

**DEMAND FOR JURY TRIAL**

127. Pursuant to Federal Rule of Civil Procedure 38, Bi hereby demands a trial by jury on all claims and issues so triable.

**PRAYER FOR RELIEF**

128. WHEREFORE, Plaintiff Cindy Bi prays for relief as follows:

A. For judgment in her favor and against Defendants Emi Nietfeld and Advance Magazine Publishers Inc., d/b/a Condé Nast, on all claims;

B. For compensatory, consequential, and general damages in amount according to proof;

C. For an award of punitive damages;

D. For her attorney's fees and costs to the extent provided by law; and

E. For such other and further relief as the Court deems just and proper.

[*Signature page to follow.*]

Dated: September 2, 2026

Respectfully submitted,

**CONTARINO ROTH LLC**
**SWEIGART MURDOCK, LLP**

By: */s/ Josiah Contarino*

Josiah Contarino
New York Bar No. 5128517
CONTARINO ROTH LLC
100 Church Street, Suite 800
New York, NY 10007
Telephone: 973-200-1926
jcontarino@contarinoroth.com

Jesse D. Franklin-Murdock*
Karin M. Sweigart*
SWEIGART MURDOCK, LLP
1160 Battery Street, Suite 100
San Francisco, CA 94111
Telephone: (415) 873-0123
Jesse@sm-llp.com
Karin.Sweigart@sm-llp.com

***Attorneys for Plaintiff***
***Xinjuan Bi, a/k/a Cindy Bi***

**pro hac vice* forthcoming